IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAISTA GUL CHUGHTAI     :     CIVIL ACTION
                         :
        v.             :
                         :
JEANES HOSPITAL AND TEMPLE    :
UNIVERSITY HEALTH SYSTEM, INC.  :     No. 11-4173

**MEMORANDUM**

**Padova, J.**                                        **September 26, 2012**

Plaintiff, Shaista Gul Chugtai, has brought this action against her former employer, Jeanes Hospital ("Jeanes"), a member of the Temple University Health System, Inc., asserting claims for race and national origin discrimination in employment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; 42 U.S.C. § 1981; and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951, *et seq.* (the "PHRA"). Before the Court is Defendants' Motion for Summary Judgment. For the reasons that follow, Defendants' Motion is granted.

I.     **BACKGROUND**[1]

Plaintiff, who is originally from Pakistan, moved to the United States in 2007.[2] (Chugtai Dep. at 13.) Later that year, she began working at Just Children day care, where she worked for two years. (Id. at 15.) In January 2008, while she was working at Just Children, she enrolled in a program at the Sanford Brown Institute to become a medical assistant. (Id. at 16-17.) Plaintiff

---

[1]We must view "the facts and draw all reasonable inferences in the light most favorable to the plaintiff," as she is the nonmoving party, thus, we have drawn our summary of the facts primarily from Plaintiff's deposition. Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007)).

[2]Before Plaintiff moved to America, she earned a bachelor's degree in history, Islamic education, and child development education in Pakistan, where she was a teacher. (Chugtai Dep. at 14-15.) She speaks four languages, English, Urdu, Panjabi, and Hindi. (Id., Ex. 19 at 2.)

worked at Jeanes twice.  The first time, Plaintiff was completing an externship requirement as part of her medical assistant program.  (Id. at 18.)  The second time, a few months after she earned her certificate as a medical assistant, her former supervisor from Jeanes asked her to return to fill a temporary position.  (Id. at 86-88.)  Plaintiff's claims arise from her experiences during both her externship and her later position with Jeanes.

A.      The Externship

In January 2009, Sanford Brown arranged for Plaintiff to become an extern at Jeanes.  (Id. at 19.)  During her externship, which lasted approximately six weeks, Plaintiff worked in two departments at Jeanes, Pre-Admissions Testing and Business Health.  (Id. at 20-21, 24.)  Elaine Proudman was her supervisor in both departments.  (Id. at 21-22.)

Plaintiff's responsibilities in the Business Health Department involved: scheduling appointments; escorting patients into their appointment rooms; taking health histories and blood pressures; scheduling x-rays, MRIs, and CT scans; getting patients their bandages and medications; and performing other tests ordered by the doctors.  (Id. at 22-23.)  In the Pre-Admission Testing Department, Plaintiff was also responsible for drawing blood and performing EKGs.  (Id. at 25-26.)  Plaintiff worked in Pre-Admission Testing for approximately two weeks of her externship.  (Id. at 24-25.)  While she was there, she had trouble with two other medical assistants, Natasha Beauchmin and Gina Rockmore.  (Id. at 23, 26.)  She also had problems with Dr. Susan Packer, who worked in both Pre-Admission Testing and Business Health.  (Id. at 26; Packer Dep. at 10-11.)

Plaintiff claims that Beauchmin and Rockmore bullied her about her national origin and

religion (Islam)[3] and were mean to her.  (Chugtai Dep. at 27-28.)  Specifically, Plaintiff reports that, while she was assigned to Pre-Admission Testing during her externship, Beauchmin:  (1) made comments about people from other countries coming to take our jobs and people from other countries not knowing how to speak English (id. at 28-29, 36); (2) made fun of Plaintiff's accent and repeatedly referred to her as a "headache" (id. at 42-44); and (3) remarked to other people (Proudman and two receptionists), that Plaintiff is stupid, and told Proudman that Plaintiff did not know how to speak to patients.  (Id. at 28.)  Rockmore once asked Plaintiff why she was wearing a long sleeved shirt under her scrubs, and Plaintiff responded by telling Rockmore that she is a Muslim and likes to cover herself.  (Id. at 38.)  In addition, both Beauchmin and Rockmore interrupted Plaintiff's appointments with patients to ask the patients whether Plaintiff was doing her job properly  (id. at 54), and failed to properly train her.  (Id. at 53-54.)

Plaintiff never complained to Jeanes's Human Resources Department or to her supervisor regarding the way she was treated while she was working in Pre-Admission Testing during her externship.  (Id. at 72-73, 245.)  However, Proudman noticed Beauchmin's and Rockford's treatment of Plaintiff and asked Plaintiff about it.  (Id. at 32-33.)  Proudman spoke to Beauchmin and Rockford about their treatment of Plaintiff and told them that their attitudes were not acceptable.  (Id. at 67-68.)

Plaintiff also maintains that Dr. Packer, a physician employed in both the Business Health and Pre-Admission Testing Departments, treated her hostilely during her externship in the following manner:  (1) by asking her to repeat things that she said; (2) demonstrating work Plaintiff was to

---

[3]Plaintiff has not brought a claim for religious discrimination.  (Pl. Mem. at 4.)  Rather, she maintains that her "Pakistani/Muslim ancestry and national origin are inextricably intertwined for purposes of her Title VII and Section 1981 Claims (and mirroring PHRA claims)."  (Id. at 4-5.)

perform in the reception area rather than in a treatment room; and (3) observing Plaintiff while she scheduled MRIs and CT Scans for patients.  (Id. at 44- 46.)  Plaintiff also recalls that, on one or two occasions,  Dr. Packer walked by when Beauchmin and Rockford complained about Plaintiff's English and laughed with them instead of disciplining them.  (Id. at 47.)

After her two weeks in Pre-Admission Testing, Plaintiff spent the rest of her externship in Jeanes's Business Health Department.  (Id. at 72.)  She considers the rest of her experience at Jeanes to have been positive.  (Id. at 77.)  After Plaintiff's externship ended, she completed her program at Sanford Brown and received a medical assistant certificate.  (Id. at 82-83.)  Plaintiff filled out a job application at Jeanes and returned to her prior job at Just Children day care.  (Id. at 78, 80-81.)

B.    The Temporary Job

In May 2009, Proudman contacted Plaintiff and asked if she would work temporarily at Jeanes to help out in the Business Health Department while she (Proudman) took a leave from her job because her husband was sick.  (Id. at 86-88.)  Proudman told Plaintiff during that call that she thought the temporary job at Jeanes would last for one month, or until her (Proudman's) husband was better, and that she would try to get Plaintiff a permanent position at Jeanes.  (Id. at 86-88.)  Plaintiff took a one-month leave from her job at Just Children to take the temporary job at Jeanes.  (Id. at 86-88.)  Jeanes's written Offer of Employment to Plaintiff states that she was offered a temporary full time, "1 month duration," position as a Medical Assistant in Business Health on May 15, 2009.  (Id. Ex. P4.)

Plaintiff started working at Jeanes on May 25, 2009.  (Id. at 89.)  The day before she started, she attended an orientation at Jeanes's Human Resources Department where she was given her identification and Employee Handbook.  (Id. at 98-99.)  The Employee Handbook contains Jeanes's

Equal Opportunity Policies, but Plaintiff did not read them and, therefore, was not aware of Jeanes's policies for filing complaints when she felt that she was being treated unfairly.  (Id. at 99-100.)

Plaintiff's temporary job at Jeanes was full time, eight hours per day, forty hours per week in the Business Health Department.  (Id. at 102.)  Her responsibilities generally included helping out the other medical assistant, Ruth; she also conducted respirator fit testing during one week.  (Id. at 90-91.)  She also took patients to appointment rooms, filed, made appointments, scheduled MRIs, x-rays and other tests, administered tuberculosis tests, and provided patients with crutches.  (Id. at 91-92.)

Plaintiff sometimes encountered Dr. Packer while she was working in Business Health during the summer of 2009.  (Id. at 93-95.)  Dr. Packer again gave Plaintiff instruction in front of other people and listened to her schedule MRIs over the phone.  (Id. at 93-94, 105.)  Dr. Packer also commented on Plaintiff's religion twice.  Once, Dr. Packer asked Plaintiff why she was wearing long sleeves and Plaintiff informed her that it was because she is Muslim.  (Id. at 104-05.)  On the second occasion, at the end of Plaintiff's stay in Business Health, Plaintiff became offended when Dr. Packer asked her why she had ordered a chicken pizza instead of pepperoni for a pizza party.  (Id. at 94-95.)  When Plaintiff told Dr. Packer that she did not eat pepperoni, Dr. Packer said, with an attitude that Plaintiff believed indicated that she was being made fun of, "oh, you are Musli[m], that's why you [didn't] order the pepperoni."  (Id. at 94-95.)

Proudman's husband died and she returned to work one month after she began her leave.  (Id. at 110.)  Plaintiff's position in Business Health did not end when Proundman returned, however, but lasted until September 2009.  (Id. at 108.)  Plaintiff believes that she retained her job in Business Health after Proudman's return because she had been made a permanent employee.  Plaintiff bases

her belief on a conversation she had with Proudman after her return.  Plaintiff asked Proudman whether she needed to go back to her job at Just Children because Proudman returned to Jeanes, and Proudman told her "no, we like you, so we are giving you the job here so you will work with us so you can resign on the job." (Id. at 110.)  Plaintiff resigned her job with Just Children in July 2009. (Id. at 110-11, 114.)  Although Plaintiff believed, at this point, that she would be staying in Business Health as a permanent employee, she did not go to Human Resources to fill out any new paperwork and never received any health or dental benefits from Jeanes.  (Id. at 112-15.)

Defendants have a different explanation for Plaintiff's retention in Business Health after Proudman's return.  Proudman believes that Plaintiff was allowed to stay in Business Health for two months after her return to help her (Proudman) get re-acclimated to the job after her husband's death. (Proudman Dep. at 38-39.)  In September 2009, Proudman received a call from Mary Weymer, who worked in Jeanes's Human Resources Department, who told Proudman that Plaintiff's temporary job in Business Health was ending.  (Id. at 39.)  Proudman then told Plaintiff that the Friday of that week would be her last day at Jeanes.  (Id. at 40.)

Maureen Kelly became the part-time office manager in Pre-AdmissionTesting in July 2009. (Kelly Dep. at 11.)  In September 2009, she learned that Rockmore would be going out on temporary medical leave.  (Id. at 17, 19.)  Kelly's boss told her that there was a medical assistant in Business Health who was going to be laid off because her job was ending and suggested hiring her for the two weeks that Rockmore would be out.  (Id. at 17-18.)  Weymer then asked Proudman if she thought that Plaintiff would want to help fill in temporarily in Pre-Admission Testing, and Proudman sent Plaintiff to Human Resources to talk to Weymer about the position.  (Proudman Dep. at 41.) Weymer told Plaintiff that there was a temporary, short-term, position available in Pre-Admission

Testing.  (Weymer Dep. at 41.)  Plaintiff asked if there was another department she could go to instead, but Jeanes did not have any open medical assistant positions in any other department at that time.  (Id. at 42.)  Weymer further told Plaintiff that the position in Pre-Admission Testing was temporary, that she would be covering for someone who was out on a leave of absence and would be back some time in October and, at that time, Plaintiff's temporary assignment at Jeanes would end and she would no longer be employed by the hospital.  (Id. at 43-44.)

Plaintiff began working in Pre-Admission Testing on September 18 or 19, 2009.  (Chugtai Dep. at 124.)  Her recollection of her switch to the Pre-Admission Testing Department is different from those of Proudman, Kelly, and Weymer.  According to Plaintiff, sometime in mid-September 2009, she was told by Proudman that the Human Resources Department was sending her to Pre-Admission Testing.  (Id. at 111.)  Human Resources insisted on the transfer, even though Proudman told Human Resources about Plaintiff's prior, negative,  experiences in Pre-Admission Testing during her externship.  (Id.)  Plaintiff then personally went to Human Resources to tell Weymer what had happened to her in Pre-Admission Testing during her externship, but was told that she would be transferred there anyway.  (Id. at 117, 121.)

About a week after Plaintiff started working in Pre-Admission Testing, she received a letter from Weymer dated September 28, 2009, that states "[w]e are pleased to confirm our offer for the position of Medical Assistant, on a Temporary Full-Time basis for the Pre-Admission Testing Department effective September 21, 2009."  (Id. at 134, Ex. P8.)  Plaintiff believed the letter meant that she would return to Business Health after her temporary stay in Pre-Admission Testing.  (Id. at 135.)

After Plaintiff began working in Pre-Admission Testing, one of the two receptionists in that

Department made an offensive comment about Plaintiff's religion.  The receptionist said: "Oh God, now have to pray to Allah to have everything will be good with you, go pray Allah, ask your Allah." (Id. at 128.)  In addition, Beauchmin's treatment of Plaintiff during her second assignment in Pre-Admission Testing was no better than during her externship.  Plaintiff describes Beauchmin's behavior as follows: (1) during the week of September 28 through October 2, 2009, Beauchmin interrupted Plaintiff during her appointments with patients and asked patients "is she doing okay, are you satisfied with her" and also informed patients "I'm fed up with this girl, she is continuing to be [a] headache for me;" (2) Beauchmin yelled at Plaintiff in front of patients; and (3) both Beachmin and Rockford instructed Plaintiff to do certain tasks that she considered to be demeaning, such as making copies, cleaning appointment rooms after appointments, and answering the phones.[4]  (Id. at 142-44, 148-49.)  Plaintiff went to Human Resources and complained to Weymer about how she was being treated two or three times during this assignment in Pre-Admission Testing.  (Id. at 158-60, 166.)  On those occasions, Plaintiff told Weymer that she was being insulted regarding her accent. (Id. at 160.)

Plaintiff became very upset and left work after being yelled at by Beauchmin on two occasions.  On Thursday, October 1, 2009, Beauchmin yelled at Plaintiff in front of a patient and Plaintiff did not return to work the next day because she was so upset.  (Id. at 156-57.)  On October 6, 2009, Beauchmin again yelled at Plaintiff in front of a patient, this time for not performing a

---

[4]Although Plaintiff insists that Rockford was working in Pre-Admission Testing while she was there from September 21 through October 9, 2009, Defendants maintain that Plaintiff was employed in Pre-Admission Testing specifically to cover Rockford's job while Rockford was on medical leave.  Defendants have submitted Rockford's Certificate to Return to Work, which was signed by Rockford's doctor, and which shows that Rockford was out on leave between September 25, 2009 and October 9, 2009.  (Kelly Dep. at 17-18; Chugtai Dep. at 153-54, Ex. P11.)

pregnancy test that Beauchmin claimed she had requested.  (Id. 163-64, 167.)  Plaintiff was already upset that day because one of the receptionists would not promptly perform a task that Plaintiff asked her to perform, and Plaintiff believed this indicated that the receptionist was ganging up with Beauchmin against her.  (Id. at 175-76.)  Plaintiff called Human Resources to complain and later met with Marie Gardner in Human Resources to report what had happened.  (Id. at 165, 167-68.)  She left work after she spoke with Gardner.  (Id. at 167.)  Plaintiff told Gardner that Beauchmin and the receptionist mistreated her "because she was thinking I'm not from this country and maybe my religion is not because when they are by my sleeves and pepperoni.  So that's because of my religion so they don't like me."  (Id. at 179.)  Beauchmin was counseled by her supervisor regarding her treatment of Plaintiff that day and was told that she could not lose her cool with Plaintiff, that it was unacceptable.  (Kelly Dep. at 26.)

Plaintiff reports that she was told between 9:00 a.m. and 10:00 a.m. on Friday, October 9, 2009, that it was her last day of work at Jeanes.  (Chugtai Dep. at 195.)  Gardner claims that she told Plaintiff on October 6, 2009, that Rockmore was expected to return to work on Monday, October 12, 2009, and that Plaintiff would need to apply for another position if she wished to remain at Jeanes. (Gardner Dep. at 30-31.)  However, Plaintiff maintains that no one told her ahead of time that her last day of work in Pre-Admission Testing, and at Jeanes, would be October 9, 2009.  (Chugtai Dep. at 171.)  She went to Human Resources at the end of the day on October 9, 2009, and asked why she was being fired.  (Id. at 197.)  She was told that she was not being fired, rather, her temporary job had ended.  (Id.)  She was also told that she could apply for another job with the hospital.  (Id. at 198-99.)

The following Monday, October 12, 2009, Plaintiff's husband called Human Resources.  (Id.

at 202.)  Both Plaintiff and her husband went to Jeanes later that day to meet with Kelly and Barbara

Thorn.[5]  (Id.)  During that meeting, Thorn and Kelly offered Plaintiff the opportunity to work in Pre-

Admission Testing for another month, but Plaintiff declined.  (Id. at 204.)  After the meeting with

Thorn and Kelly, Plaintiff's husband made several unsuccessful attempts to speak with the hospital's

director.  (Id. at 207-08.)  Plaintiff and her husband also filled out a General Complaint Form, stating

that Plaintiff had been harassed and discriminated against based on her national origin, creed, and

race, and faxed it to Human Resources.  (Id. at 208-09, Ex. P16.)  Gardner investigated the

Complaint but found that there was no evidence that Plaintiff had been treated differently because

of her race, national origin, or religion.  (Gardner Dep. at 25-28, 41-49.)  Plaintiff later applied for

other positions with Jeanes and the Temple University Health System, but was not hired.  (Chugtai

Dep. at 218-21.)  In 2010, Plaintiff obtained a job working for a day care.  (Id. at 222-23.)  Plaintiff

moved to Florida in 2011.  (Id. at 223.)

The Complaint asserts three causes of action.  Count I alleges that Plaintiff was subjected to

a hostile work environment and that she was fired in retaliation for complaining about discrimination

and/or on the basis of her race and national origin, all in violation of Title VII .  (Compl. ¶¶ 33-34.)

Count II alleges that Plaintiff was subjected to a hostile work environment and that she was fired in

retaliation for complaining about discrimination and/or because of her race, ethnic characteristics,

and/or ancestry; and that she was not rehired because of her race and her complaints of

discrimination by Defendants, all in violation of 42 U.S.C. § 1981.  (Id. ¶¶ 36-38.)  Count III alleges

---

[5]Kelly's job responsibilities as Office Manager in Pre-Admission Testing include direct supervision of the medical assistants in that department.  (Kelly Dep. at 7, 10.)  Barbara Thorne is Jeanes's Director of Health Information and has been Kelly's supervisor since July 2009.  (Id. at 8-9.)

that Plaintiff was subjected to a hostile work environment and that she was fired in retaliation for complaining about discrimination and/or because of her race/national origin in violation of the Pennsylvania Human Relations Act ("PHRA").  (Id. ¶¶ 40-41.)

## II.   LEGAL STANDARD

Defendants have moved for summary judgment as to all of Plaintiff's claims.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." Id. at 325.  After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by:  (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has] cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex,

477 U.S. at 322.  In evaluating the evidence, we take the facts "in the light most favorable" to the nonmoving party and "draw all reasonable inferences" in her favor.  Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007));  Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 680 (3d Cir. 2003).  Nonetheless, "[s]peculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000), aff'd 29 F. App'x 100 (3d Cir. 2002). Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial.  Callahan v. AEV, Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)).

## III.    DISCUSSION

Plaintiff has brought her discrimination claims pursuant to Title VII, 42 U.S.C. § 1981, and the PHRA. Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  The PHRA similarly makes it unlawful for any employer to discharge or otherwise discriminate against an employee based on that employee's "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability . . . ." 43 Pa. Stat. Ann. § 955(a).  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . ." 42 U.S.C. § 1981(a).  Section 1981

protects individuals who are discriminated against based on their ancestry and ethnic characteristics, in additional to individuals who are discriminated against based on their race.  Mulholland v. Classic Mgmnt. Inc., Civ. A. No. 09–2525, 2010 WL 2470834, at *2 (E.D. Pa. June 14, 2010) (quoting St. Francis Coll. v. Al–Khazraji, 481 U.S. 604, 613 (1987)).  "Thus, if a plaintiff 'can prove that [she] was subjected to intentional discrimination based on the fact that [she] was born [into a particular ethnic group], rather than solely on the place or nation of [her] origin, or [her] religion, [she] will have made out a case under § 1981.'"  Id. (alterations in original) (quoting St. Francis Coll., 481 U.S. at 613).

We analyze claims brought pursuant to Title VII, the PHRA and Section 1981 pursuant to the same standard.  See Verma v. Univ. of Pa., Civ. A. No. 11-611, 2012 WL 1835727, at *7 (E.D. Pa. May 18, 2012) ("Discrimination claims under the PHRA are subject to the same standards as Title VII for purposes of summary judgment."  (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999))).  See also  id. ("Race discrimination claims under § 1981 are also treated 'virtually identical[ly]' to Title VII discrimination claims at the summary judgment stage."  (alteration in original) (quoting Langley v. Merck & Co., Inc., 186 F. App'x 258, 261 n.2 (3d Cir. 2006))).  Plaintiff's claims fall into four groups: (1) a claim of discrimination based on her race, national origin, ethnicity, and/or ancestry brought pursuant to Title VII, Section 1981, and the PHRA; (2) a hostile work environment claim based on Plaintiff's race, national origin, ethnicity, and/or ancestry brought pursuant to Title VII, Section 1981, and the PHRA; (3) a claim that she was fired in retaliation for her complaints of discrimination based on her race, national origin, ethnicity, and/or ancestry brought pursuant to Title VII, Section 1981, and the PHRA; and (4) a claim that Defendants failed to rehire her based on her race and national origin/ethnicity brought pursuant to

13

Section 1981.

      A.    <u>Discrimination</u>

The Complaint alleges that Plaintiff was discriminated against in violation of Title VII, Section 1981 and the PHRA because she was terminated from her employment at Jeanes on the basis of her race, national origin, ethnicity, and ancestry.  (Compl. ¶¶ 34, 37, 41.)  Plaintiff concedes that she does not have direct evidence of discrimination and that her discrimination claim should be analyzed pursuant to the burden shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  (Pl.'s Mem. at 33.)  "Under <u>McDonnell Douglas</u>, the plaintiff bears the initial burden of demonstrating a prima facie case of unlawful discrimination or retaliation." <u>Dellapenna v. Tredyffrin/Easttown Sch. Dist.</u>, 449 F. App'x 209, 213 (3d Cir. 2011) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).  In order to establish a prima facie case of discrimination, Plaintiff must establish:

> (1) she belongs to a protected class; (2) she was qualified for her employment position; (3) despite her qualifications, she was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances that raise an inference of discriminatory action, such as the employer treating similarly situated persons not belonging to the plaintiff's protected class more favorably.

<u>Verma</u>, 2012 WL 1835727, at *8 (citing <u>Sarullo v. United States Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003)).

If Plaintiff succeeds in establishing a prima facie case of discrimination, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision." <u>Dellapena</u>, 449 F. App'x at 213 (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).  If the employer is able to meet its "'relatively light burden,'" "the burden of production returns to the plaintiff, who can defeat summary judgment only by showing by a preponderance of the evidence

14

that the employer's stated reason is pretextual." Id. (quoting and citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)).   Consequently, if Defendants are able to state a legitimate and nondiscriminatory reason for Jeanes's termination of Plaintiff's employment, Plaintiff  "must produce evidence that either '(1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of'" her termination. Id. (quoting Fuentes, 32 F.3d at 762).  In order to meet her burden at this last step, "plaintiff must uncover 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's explanations that would permit a reasonable factfinder to believe that the employer did not actually act for its stated reasons." Id. (quoting Fuentes, 32 F.3d at 765).

Defendants argue that they are entitled to summary judgment on Plaintiff's discrimination claim because she has not met her initial burden of demonstrating a prima facie case of discrimination.  See Dellapenna, 449 F. App'x at 213.  Defendants do not contest that Plaintiff belongs to a protected class or that she was qualified for her position as a medical assistant.  They maintain, however, that Plaintiff was not subjected to an adverse employment action because she was not fired from her position, rather, her temporary position ended solely because Rockmore, the person whose job she was filling on a temporary basis, was ready to return to work.  They also argue that the record contains no evidence that creates an inference of discrimination.  Assuming, *arguendo*, that the termination of Plaintiff's employment with Jeanes was an adverse employment action, we consider whether her employment was terminated under circumstances giving rise to an inference of discrimination.

Plaintiff contends that the following circumstances give rise to an inference of discrimination (Pl.'s Mem. at 39.): she was the only Pakistani and/or Muslim individual working in the Business Health and Pre-Admission Testing Departments at Jeanes. (Chugtai Dep. at 35; Packer Dep. at 19; Proudman Dep. at 46); individuals employed in the Pre-Admission Testing Department made derogatory comments to her about her accent and their difficulty understanding her spoken English, both during her externship and during her temporary assignment to Pre-Admission Testing in late September and early October 2009 (the "temporary assignment in Pre-Admission Testing"); and Dr. Packer failed to discipline employees for making remarks about Plaintiff's accent and instead laughed at those remarks.[6] (Chugtai Dep. at 47-48.) To support her assertion that her co-workers made derogatory comments about her race, national origin, ancestry and ethnicity during her externship, Plaintiff relies on remarks she claims Beauchmin made during her externship criticizing individuals who come from other countries and don't know how to speak English, making fun of Plaintiff's accent, telling Plaintiff that she couldn't understand her, and asking Plaintiff to use the words "please" and "thank you" when Plaintiff made a request of Beauchmin. (Pl.'s Mem. at 42; Chugtai Dep. at 28, 34-35, 36, 43-44, 51-52.) Plaintiff also relies on the fact that Rockmore asked Plaintiff why she wore long sleeves. (Chugtai Dep. at 38.) To support her assertion that her co-workers made derogatory comments regarding her race, national origin, ancestry, and ethnicity

---

[6]Plaintiff specifically relies on the following comment that she claims Dr. Packer made after observing Beauchmin and Rockmore make derogatory comments about people who come from other countries: "no, Natasha, they are okay, they are doing okay, their attitude. Like she needed -- she don't know. That's what Dr. Packer, that's what I would find it. Like she said like it's all my fault because I could not do anything." (Chugtai Dep. at 47-48.) We are unable to understand the meaning of this remark or to draw the inference suggested by Plaintiff that Dr. Packer meant this remark to condone discriminatory comments made by Beauchmin and Rockmore.

during her temporary assignment in Pre-Admission Testing, Plaintiff relies on a comment made by one of the receptionists in that Department that Plaintiff's return would mean she had to pray to Allah.  (Id. at 128.)  Although Plaintiff claims that Dr. Packer was present when the receptionist made the remark about Allah, Plaintiff does not contend that Dr. Packer heard, agreed with, or laughed at that remark.  (Id. at 128.)  Plaintiff also maintains that Beauchmin continued to make statements to her about her accent and ability to speak English during her temporary assignment in Pre-Admission Testing.  (Id. at 142-43.)

Beauchmin, Rockmore, the Pre-Admission Testing Department receptionist, and Dr. Packer were Plaintiff's coworkers.  There is no evidence in the record of the instant Motion that any of these individuals had any decision making authority or participated in any way in making the decision to terminate Plaintiff's employment with Jeanes on October 9, 2009.  "[C]omments by those individuals outside of the decisionmaking chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination."  Walden v. Georgia-Pacific Corp., 126 F.3d 506, 521 (3d Cir. 1997) (citing Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1085 (3d Cir. 1995); and Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 546 (3d Cir. 1992)).  Plaintiff has not submitted any other evidence that would support her argument that her termination "occurred under circumstances that raise an inference of discriminatory action," such as evidence that Jeanes and the Temple University Health System treated "similarly situated persons not belonging to the plaintiff's protected class more favorably."  Verma, 2012 WL 1835727, at * 8 (citing Sarullo, 352 F.3d at 797).  Viewing the facts in the light most favorable to Plaintiff, we conclude, accordingly, that Plaintiff has failed to respond to the Motion for Summary Judgment with a factual showing sufficient to establish that she was fired under circumstances that raise an

inference of discriminatory action and, thus, has failed to establish a prima facie case of discrimination with respect to her claim that she was terminated from her position as a Medical Assistant at Jeanes as a result of discrimination based on her race, national origin, ethnicity, and/or ancestry.  Defendant's Motion for Summary Judgment is, accordingly, granted with respect to those portions of Counts I, II, and III that assert that Plaintiff was terminated from her position because of her race, national origin, ethnicity and/or ancestry in violation of Title VII, Section 1981, and the PHRA.

       B.    Hostile Work Environment

The Complaint alleges that Plaintiff was subjected to a hostile work environment during her externship and while she was temporarily assigned to the Pre-Admission Testing Department in violation of Title VII, Section 1981, and the PHRA.  (Compl. ¶¶ 33, 36, 40.)

The Third Circuit has explained that harassment of an employee on the basis of her membership in a protected class creates a hostile work environment when the harassment "'unreasonably interferes with [the employee's] performance or creates an intimidating, hostile, or offensive working environment.'"  Grassmyer v. Shred-It USA, Inc., 392 F. App'x 18, 29-30 (3d Cir. 2010) (quoting Weston v. Pennsylvania, 251 F.3d 420, 425-26 (3d Cir. 2000), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)).  "To be actionable, 'the harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment.'"  Id. at 30 (quoting Weston, 251 F.3d at  426.)  In order to succeed on a hostile work environment claim, Plaintiff has the burden of proving the following five factors: "(1) she suffered intentional discrimination because of her [membership in a protected class]; (2) the discrimination was severe or pervasive; (3) the discrimination

18

detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006) (footnotes omitted), overruled in part on other grounds by Burlington N., 548 U.S. 53, (citing Weston, 251 F.3d at 426; and Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300-01 (3d Cir. 1997)); see also Tarr v. FedEx Ground, 398 F. App'x 815, 819 (3d Cir. 2010) (citing West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995)). The last element "establishes the basis on which to hold the employer liable." Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009).

Defendants argue that they are entitled to the entry of summary judgment in their favor on Plaintiff's hostile work environment claims because Plaintiff cannot establish that the harassment she suffered was severe or pervasive and because the evidence of record cannot support employer liability for this claim. Title VII, Section 1981, and the PHRA prohibit "severe or pervasive harassment; [they do] not mandate a happy workplace. Occasional insults, teasing, or episodic instances of ridicule are not enough; they do not 'permeate' the workplace and change the very nature of the plaintiff's employment." Jensen, 435 F.3d at 451 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); and Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Indeed, the Supreme Court has explicitly stated that "conduct must be extreme to amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788; see also Peace-Wickham v. Walls, 409 F. App'x 512, 519 (3d Cir. 2010) (same) (quoting Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005)).

We weigh the following factors in determining whether harassment is severe and pervasive: "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" <u>Jensen</u>, 435 F.3d at 451 (quoting <u>Harris</u>, 510 U.S. at 23).  "No one factor is dispositive, and the analysis must focus on the 'totality of the circumstances.'" <u>Id.</u> at 451-52 (quoting <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1482 (3d Cir. 1990)).  Plaintiff testified at her deposition that Beauchmin and Rockmore frequently made fun of her accent and made derogatory remarks about people who come from other countries and don't speak English.  (Chugtai Dep. at 28, 36, 43, 51.)  These comments were made over the course of two weeks in January 2009 and three weeks from September 18, 2009 through October 9, 2009.  Plaintiff also testifies that Dr. Packer was present on one or two occasions when those remarks were made, laughed and did nothing to stop them.  (<u>Id.</u> at 47.)  "'[T]he mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability.'" <u>Brown-Baumbach v. B&B Auto., Inc.</u>, 437 F. App'x 129, 133 (3d Cir. 2011) (quoting <u>Weston</u>, 251 F.3d at 428); <u>see also</u> <u>Grassmyer</u>, 392 F. App'x at 25, 30 (citations omitted) (determining that regular comments made by supervisor regarding his genitalia and intimate details of his sexual relationships, referring to women as "'bitches,'" use of the word "fuck" in the office, and playing a compact disc containing sexually explicit language in a conference room in which the female plaintiffs were working, did not support a hostile work environment claim, even when considered together with evidence that plaintiffs "may have been neglected and treated unequally").

Plaintiff also reports two occasions on which she was asked why she was wearing long sleeves and one occasion on which she was asked why she was not eating pepperoni.  (Chugtai Dep. at 38 at 94-95, 104-05.)  We find that there is nothing about the circumstances or contents of these remarks, as reported by Plaintiff, that would support the conclusion that they were intended to be

discriminatory or offensive.  An offensive remark about Allah was made on one occasion, but

Plaintiff does not contend that she was ever physically threatened or humiliated.  There is no

evidence that this conduct unreasonably interfered with Plaintiff's work performance during either

her externship or her temporary assignment in Pre-Admission Testing.[7]  (Id. at 156-57.)

We conclude, based on the totality of the circumstances as reported by Plaintiff in her

deposition, that Plaintiff has failed to respond to Defendants' Motion for Summary Judgment with

a factual showing sufficient to establish that the harassment she claims she experienced based on her

race, national origin, ethnicity, and/or ancestry was severe or pervasive.  Defendant's Motion for

Summary Judgment is, accordingly granted with respect to those portions of Counts I, II, and III that

assert that Plaintiff was subjected to a hostile work environment because of her race, national origin,

---

[7]Plaintiff did testify at her deposition that she left work early because Beauchmin yelled at her in front of a patient on two occasions.  While Plaintiff claims that she was too upset to return to work the day after Beauchmin yelled at her on Thursday, October 1, 2009, she was unable to remember why Beauchmin yelled at her and did not testify at her deposition that Beauchmin's statements to her were in any way related to her race, national origin, ethnicity, or ancestry. (Chugtai Dep. at 156-57.)  On one additional occasion on October 6, 2009, Beauchmin yelled at Plaintiff in front of a patient for not performing a pregnancy test that Beauchmin claimed she had requested.  (Id. 163-64.)  Plaintiff went to Human Resources and told Marie Gardner what had happened, and then left work.    (Id. at 165, 167-68.)  While Plaintiff told Gardner that it was her belief that Beauchmin yelled at her because of her national origin and religion (id. at 178-79), she has not reported that Beauchmin used any words regarding Plaintiff's national origin, accent, ability to speak English, or religion on that occasion.  Plaintiff's unsupported belief that she was harassed based on her race, national origin, ethnicity, and/or ancestry "is insufficient to withstand summary judgment." Wilson v. Lock Haven Univ., 474 F. App'x 74, 76 (3d Cir. 2012) (citing Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  See also Habib v. Urban Outfitters, Inc., Civ. A. No. 03-1561, 2004 WL 765119, at *6 (E.D. Pa. Apr. 1, 2004) ("A plaintiff's own assertion of racial animus does not give rise to an inference of unlawful discrimination." (citation omitted)).  The record thus does not support Plaintiff's claim that Beauchmin yelled at her on account of her race, national origin, ethnicity, and/or ancestry on that occasion.  Rather, it appears that Beauchmin yelled at Plaintiff in the midst of a heated disagreement regarding Plaintiff's job performance.  We find, therefore, that the evidence of record is insufficient to establish that these incidents were discriminatory in nature.

ethnicity, and ancestry in violation of Title VII, Section 1981, and the PHRA.[8]

C.      Retaliation

The Complaint alleges that Plaintiff was terminated in retaliation for complaining about discrimination in violation of Title VII, Section 1981, and the PHRA.  (Compl. ¶¶ 34, 37, 41.)  "In the absence of direct evidence of retaliation, retaliation claims . . . typically proceed under the McDonnell Douglas framework."  Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005) (citations and footnotes omitted).  To establish a prima facie case of retaliation, a plaintiff must establish:  "(1) [s]he engaged in protected activity, (2) [her] employer took an adverse employment action against [her], and (3) there was a causal connection between [her] participation in the protected activity and the adverse employment action."  Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 (3d Cir. 2010) (footnote omitted) (citing Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006)).  "As with discrimination claims, if a plaintiff establishes a prima facie case, the employer must show a legitimate, non-discriminatory reason for the adverse action.  The burden then shifts back to the plaintiff to demonstrate that the offered reason is pretextual."  Warfield v. SEPTA, 460 F. App'x 127, 131 (3d Cir. 2012) (citing Moore, 461 F.3d at 342).  Protected conduct includes "the filing of formal charges of discrimination and informal protests of discriminatory activities, such as making complaints to management."  Id. (citing Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995)).  Protected activity does not encompass "very generalized complaints about unfair treatment.  At a minimum, the conduct must convey a protest of discriminatory practices such that

---

[8]Since we have granted Defendants' Motion for Summary Judgment with respect to Plaintiff's hostile work environment claim because she was unable to establish that the alleged harassment was severe or pervasive, we need not address Defendants' argument that they are entitled to summary judgment because Plaintiff was unable to prove a basis for employer liability.

it will be understood that a complaint about an unlawful employment practice has been advanced." Id. (citing Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)).

Defendants argue that they are entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff never engaged in protected activity, she suffered no adverse action, and they had legitimate, non-retaliatory reasons for her discharge.  Plaintiff maintains that she engaged in the protected activity of making verbal complaints about discriminatory treatment to individuals employed in Jeanes's Human Resources Department.  She did not make any complaints to Human Resources during her externship.  (Chugtai Dep. at 243.)  However, when she was first informed that she would be transferred to Pre-Admissions Testing in September 2009, she spoke with Weymer in Human Resources and told her that she did not want to go to Pre-Admissions Testing because of her negative experience there during her externship.  Plaintiff testified at her deposition that she told Weymer the following:  "I don't think so, if I go there they had already bad attitude with me and I have a very [sic] experience working with them so I don't want to go there."  (Id. at 239.)  Before Weymer met with Plaintiff, she spoke with Proudman, who told her (Weymer) that Plaintiff was not happy in Pre-Admission Testing during her externship, and might not want to go back there, because her coworkers in Pre-Admission Testing had treated her rudely and told her to speak English. (Proudman Dep. at 52-53.) Plaintiff also testified that she went to Human Resources again the week after she began working in Pre-Admission Testing in September, and complained to Weymer that the harassment by her coworkers was worse than it had been during her externship:

Q.  Do you remember what you said to [Weymer]?

A.  Yeah, because I say you send me, you said it will be not the same

situation you had in externship but they are having the same situation with me they are treating with me, like they are insulting me and the same thing what happened in the externship it's more worse than. And she say okay, I will talk to them.

Q. When you spoke with [Weymer] the first time did you ever mention anything about your race?

A. Yeah, because I already told them before I go it's because of they don't like me.

Q. I understand that . . . . I'm talking specific about this conversation that you had with [Weymer] after the break. Did you mention I think this is because of my race?

A. I did not say word race but I say it's the same situation as having, they are insulting me and again they are picking me my speaking and something and everything is going on again the same way.

(Chugtai Dep. at 159-60.)  In addition, on October 6, 2009, Plaintiff called Human Resources sometime around noon and spoke with Gardner because she was very upset after Beauchmin yelled at her and insulted her in front of a patient.  (Id. at 176-78.)  She told Gardner that she believed that Beauchmin had yelled at her because she is from Pakistan and because of her religion.  (Id. at 178-79.)  Viewing the evidence in the light most favorable to Plaintiff, and drawing all inferences in her favor, we find that Weymer was aware, from her conversation with Proudman, that Plaintiff had been harassed about her accent and ability to speak English and that the complaint she made the week she began her temporary assignment in Pre-Admission Testing referred to that harassment.  We also find that Plaintiff told Gardner on October 6, 2009 that she believed that she was being harassed based on her national origin and religion.  Consequently, we find that there is evidence in the record that Plaintiff engaged in the protected activity of complaining to Jeanes's Human Resources Department that she had been harassed based on her national origin and ethnicity.

24

Plaintiff's employment with Jeanes terminated on October 9, 2009, three days after her last complaint to Human Resources.  We again assume, *arguendo*, that Plaintiff's termination was an adverse employment action.  The short time period between Plaintiff's complaints that she had been harassed based on her membership in a protected class and her termination is evidence of a causal connection between Plaintiff's complaints and her termination.  See Fasold, 409 F.3d at 190 (stating that "when only a short period of time separates an aggrieved employee's protected conduct and an adverse employment decision, such temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn." (citing Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997)).  We conclude, therefore, that Plaintiff has established a prima facie case of retaliation.  See Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 369 (3d Cir. 2008) (noting that "the plaintiff's burden at this first stage is not particularly onerous").

Defendants maintain that they had a legitimate, non-discriminatory reason for Plaintiff's termination, namely, she was a temporary employee who was filling in for a medical assistant, Rockmore, who had been out on medical leave and who had been cleared by her doctor to return to work.  Jeanes originally hired Plaintiff on a temporary basis to fill in for Proudman in Business Health when Proudman went out on leave, beginning on May 25, 2009, to take care of her husband. (Chugtai Dep. at 86-88.)  Jeanes's written Offer of Employment for Plaintiff states that she was offered a temporary full time, "1 month duration," position as a Medical Assistant in Business Health on May 15, 2009.  (Id. Ex. P4.)  Defendants maintain that Plaintiff's position in Business Health ended in September 2009 and she was offered the opportunity to take a second temporary position filling in for Rockmore in Pre-Admission Testing while Rockmore was out on medical leave. (Proudman Dep. at 39-40; Kelly Dep. at 17-19; Weymer Dep. at 41.)  Weymer told Plaintiff that the

25

position in Pre-Admission Testing was temporary, that she would be covering for someone who was out on a leave of absence and would be back some time in October and, at that time, Plaintiff's temporary assignment at Jeanes would be complete and she would no longer be employed by the hospital. (Weymer Dep. at 43-44.) On September 28, 2009, approximately one week after Plaintiff started her assignment in Pre-Admission Testing, Weymer sent Plaintiff a letter confirming the temporary nature of that assignment. (Chugtai Dep. Ex. P8.) The letter states, "[w]e are pleased to confirm our offer for the position of Medical Assistant, on a Temporary Full-Time basis for the Pre-Admission Testing Department effective September 21, 2009." (Id.)

Gardner learned on October 6, 2009, that Rockmore had obtained medical clearance to return to work on October 12, 2009. (Gardner Dep. at 29-30.) Rockmore's Certificate to Return to Work, which is dated October 6, 2009, states that Rockmore had been under a surgeon's care from September 25, 2009 until October 9, 2009, and would be able to return to full duty with no restrictions on October 12, 2009. (Chugtai Dep., Ex. P11.) Gardner notified Plaintiff on October 6, 2009, after she received Rockmore's Certificate of Return to Work, that Rockmore would return on October 12 and that Plaintiff's last day would, therefore, be October 9, 2009. (Gardner Dep. at 29-30, Jeanes Ex. 15 at TUH00036.) We conclude, based on this evidence, that Defendants have satisfied their burden of showing "a legitimate, non-discriminatory reason" for the termination of Plaintiff's employment with Jeanes. See Warfield, 460 F. App'x at 131.

Plaintiff contends that Defendants' stated reason for her termination is pretextual because she was actually a permanent employee. Plaintiff bases her belief that she was a permanent employee of Jeanes Hospital on a conversation she had with Proudman after Proudman returned to work in July 2009. According to Plaintiff, she asked Proudman whether she needed to go back to her job at

26

Just Children after Proudman returned to Jeanes, and Proudman told her that she was being made a permanent employee and that she should resign her job with Just Children. (Chugtai Dep. at 110, 112-13.) Although Plaintiff believed, at this point, that she would be staying in the Business Health Department as a permanent employee, she did not go to Human Resources to fill out any new paperwork and never received any health or dental benefits from Jeanes. (Id. at 112-15.) Plaintiff further assumed that she would return to her job in Business Health after her temporary assignment in Pre-Admission Testing concluded. (Id. at 120.) She based this assumption on her belief that she had been made a permanent employee at Jeanes.[9]

Plaintiff's claim that she was a permanent employee of Jeanes who was fired on October 9, 2009, rather than a temporary employee whose position ended on that date because the employee she was filling in for was returning is not supported by any record evidence outside of her own deposition testimony. Indeed, Proudman denies telling Plaintiff that she should resign her job with Just Children. (Proudman Dep. at 65.) Plaintiff admits that she never received any information from Jeanes's Human Resources Department confirming that she had been made a permanent employee, and that she never went to Human Resources to confirm that she was a permanent employee. (Chugtai Dep. at 114-15.) Plaintiff also admits that she never received any benefits from Jeanes,

---

[9]Plaintiff claims that Proudman told her that she would return to Business Health after her assignment in Pre-Admission Testing as follows:

> Q.  Did Elaine tell you at any point that you were coming back to Business Health?
> A.  Yeah, she said.
> Q. Or was that your understanding?
> A.  I say how long I have to [stay] there.  She say I but maybe she will come here and maybe you will go to other end of department.

(Chugtai Dep. at 136.)  We find that Proudman's alleged response to Plaintiff's question does not support Plaintiff's contention that Proudman told her that she would return to Business Health after her temporary assignment to Pre-Admission Testing.

such as insurance, that would be expected for a permanent employee.  (Id. at 112.)  Furthermore, Plaintiff has not consistently taken the position that she had been hired as a full time employee with Jeanes after Proudman returned from her leave.  Plaintiff actually stated in her October 2009 complaint to the PHRA that she took the temporary assignment in the Pre-Admission Testing Department beginning on September 18, 2009, because she hoped to be hired full time by Jeanes.  (Chugtai Dep. Ex. P19 at TUH00183.)  "As a general proposition, 'conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.'"  Gonzalez v. Sec'y of Dep't of Homeland Sec., 678 F.3d 254, 263 (3d Cir. 2012) (quoting Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009)).  This is no less true for unsupported, self-serving deposition testimony.  See Irving v. Chester Water Auth., 439 F. App'x 125, 127 (3d Cir. 2011) (noting that "self-serving deposition testimony is insufficient to raise a genuine issue of material fact" in connection with a motion for summary judgment).  We find, accordingly, that Plaintiff's wholly unsupported belief that she had been hired as a full-time employee by Jeanes does not provide support for her claim that Defendants' non-discriminatory reason for her termination was pretextual.

We conclude, therefore, that Plaintiff has failed to respond to Defendants' Motion for Summary Judgment with a factual showing sufficient to establish that Defendants' legitimate non-discriminatory reason for her termination was pretextual.  Defendants' Motion for Summary Judgment is, therefore, granted as to Plaintiff's claim that she was fired in retaliation for making complaints that she had been discriminated against on the basis of her race, national origin, ethnicity and ancestry in violation of Title VII, Section 1981, and the PHRA.

D.     Failure to Hire

The Complaint alleges that Defendants failed to rehire Plaintiff based on her race, national

28

origin, ethnicity, and ancestry in violation of Section 1981.  Since Plaintiff does not claim that there is direct evidence that Defendants failed to rehire her based upon her race, national origin, ethnicity, and ancestry, we utilize the <u>McDonnell Douglas</u> framework.  "In a failure-to-hire case . . . a plaintiff must make a prima facie showing that:  (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position sought; (3) [s]he was rejected despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to plaintiff's to fill the position."  <u>Waris v. Heartland Home Healthcare Servs., Inc.,</u> 365 F. App'x 402, 404 (3d Cir. 2010) (citing <u>Sarullo</u>, 352 F.3d at 797).  If Plaintiff is able to establish a prima facie case, "the burden shifts to the employer to show that the action it took was not discriminatory."  <u>Id.</u> (citing <u>Sarullo</u>, 352 F.3d at 797).  "If an employer presents a non-discriminatory reason for the decision not to hire, the burden shifts to the plaintiff to 'present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision.'"  <u>Id.</u> (quoting <u>Kautz v. Met-Pro Corp.</u>, 412 F.3d 463, 467 (3d Cir. 2005)).  To satisfy her burden, Plaintiff must present evidence that:  "(1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'"  <u>Id.</u> at 404-05 (quoting <u>Fuentes</u>, 32 F.3d at 762).

Defendants argue that they are entitled to summary judgment in their favor with respect to Plaintiff's failure to rehire claim because they had non-discriminatory reasons for deciding not to hire Plaintiff for the positions she applied to after her temporary position was terminated on October 9, 2009.  Plaintiff applied for five positions with entities within the Temple University Hospital System

after October 9, 2009.  (Weymer Dep., Ex. Jeanes 11.)  One of those positions was with Temple Physicians, Inc., not Jeanes Hospital.  (Id. at 70-71.)  There were 214 applicants for that position, and Defendants have presented no evidence regarding the individual who was hired for that job.  (Id. at 70, Ex. Jeanes 11.)  Plaintiff also applied for the position of ED Department Reception Liason at Jeanes.  (Id., Ex. Jeanes 11.)  There were 152 applicants for that position.  (Id., Ex. Jeanes 11.)  The position was, however, cancelled, and no one was hired.  (Id. at 71, Ex. Jeanes 11.)  Plaintiff also applied for a nursing assistant position with Jeanes.  (Id., Ex. Jeanes 11.)  There were 130 applicants for that position, and Jeanes hired an Hispanic woman with  more than nine years of experience.  (Id. at 71-72, Ex. Jeanes 11.)  Plaintiff also applied for a nursing assistant position in the medical/surgical per diem pool with Jeanes.  (Id., Ex. Jeanes 11.)  There were 115 applicants for that position and Jeanes hired a Caucasian woman who was already working for Jeanes (an internal applicant) for that position.  (Id. at 69-70, Ex. Jeanes 11.)  Plaintiff applied for one additional nursing assistant position, also in the medical/surgical department with Jeanes.  (Id., Ex. Jeanes 11.)  There were 106 applicants for that position, which was filled by a woman of Pacific Islander ethnicity who had more than four years of experience.  (Id. at 69-70, Ex. Jeanes 11.)  We find that three of the five positions that Plaintiff applied for were filled by individuals who were presently working for Jeanes or who had more experience than Plaintiff (who, at the time of her applications, had less than a year of experience as a Medical Assistant).  Of the other two positions, one was cancelled and Defendants did not continue to seek out other individuals to fill that position, and one was filled by an individual about whom we have no information.

Plaintiff has put forward no evidence that she was rejected for these five positions "under circumstances that raise an inference of discriminatory action."  Waris, 365 F. App'x at 404.

Plaintiff relies on Jeanes's hiring an African American woman as a medical assistant in the Business Health Department in 2011 and its hiring a medical assistant from a temporary agency to cover for Rockmore while Rockmore was on a medical leave, also in 2011.[10] (Pl.'s Mem. at 46; Packer Dep. at 18-19, Kelly Dep. at 14.)  Plaintiff, however, does not claim that she applied for any jobs at Jeanes in 2011 and the only evidence in the record revealing the dates of Plaintiff's job applications lists only jobs that Plaintiff applied for within the Temple University Hospital System in 2010.  (Chugtai Dep. Ex. P18.)  The mere fact that Jeanes hired two women for positions that Plaintiff did not apply for does not constitute evidence that Jeanes failed to hire Plaintiff for jobs that she did apply for under circumstances that raise an inference of discriminatory action.

We conclude that Plaintiff has failed to respond to Defendants' Motion for Summary Judgment with a factual showing sufficient to establish a prima facie case that Defendants failed to rehire her in violation of Section 1981.  Defendants' Motion for Summary Judgment is, therefore, granted as to Plaintiffs' claim that Defendants failed to rehire her based upon her race, national origin, ethnicity and/or ancestry in violation of Section 1981.

---

[10]Plaintiff also suggests that retaliation can be inferred from the fact that she submitted her Complaint to Jeanes prior to applying for new positions with Jeanes in February 2010.  However, nearly four months passed between the date she faxed her Complaint to Jeanes and the day she applied for those five positions, and we conclude that the temporal proximity of her Complaint to the date she submitted those applications does not by itself establish a prima facie case that Defendants failed to rehire her in violation of Section 1981.

IV.     CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in its entirety.  An appropriate order follows.

BY THE COURT:

/s/John R. Padova
_____
John R. Padova, J.